UNITED STATES DISCTIRCT COURT FILED
DISTRICT OF MASSACHUSETTS CLERKS OFFICE

2004 OCT 20 P 3: 38

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| STEPHEN PATTERSON and WOBURN FIRE FIGHTERS ASSOCIATION, LOCAL 971, I.A.F.F., Plaintiffs, | ) ) ) ) ) | Civil Action No. 04-CV-12190 JLT |
| v. | ) ) | |
| PAUL TORTOLANO, CHIEF OF THE CITY OF WOBURN FIRE DEPARTMENT and CITY OF WOBURN, Defendants. | ) ) ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## I.    INTRODUCTION

Plaintiff, Stephen Patterson, is a firefighter for the Defendant City of Woburn ("City").

Because of a severe back injury which he suffered in the line of duty, Mr. Patterson has been

unable to return to his position as a firefighter since August 18, 2004.  Patterson brings this

motion for preliminary injunctive relief because the City of Woburn and Defendant Paul

Tortolano, the Chief the City's Fire Department have unlawfully discontinued Patterson's injury

leave benefits in violation of M.G.L. c. 41, §111F.  In addition, Defendants have denied him a

due process hearing to challenge the cut off of his statutory benefits and the termination of his

employment, in violation of M.G.L. c. 41, §111F, the collective bargaining agreement between

the City and Plaintiff Woburn Fire Fighters Association, Local 971, I.A.F.F. (the "Union"), and

Mr. Patterson's right to due process of law as guaranteed by the Fourteenth Amendment of the

United States Constitution, 42 U.S.C. §1983.  In addition, Defendants have refused to allow Mr.

Patterson the right to return to limited duty, as provided under the collective bargaining

agreement. Accordingly, a preliminary injunction is necessary to restore the status quo, and to prevent Defendants from cutting off all source of income to Mr. Patterson, until this matter can be expeditiously resolved through a due process hearing or arbitration. Without such preliminary injunctive relief, Plaintiff is without funds to support himself and his family, and will be unable to obtain the necessary physical therapy to alleviate his back injury and pain.

As set forth below, preliminary injunctive relief is necessary because Defendants have refused to provide Mr. Patterson with a due process hearing to challenge the cut-off of his statutory benefits and his termination. Further, Defendants are contesting Mr. Patterson's right to pursue this matter to arbitration under the collective bargaining agreement. Further, Defendants are denying Mr. Patterson the right to return to limited duty, despite the fact that his treating physician has cleared him to do so. Because Mr. Patterson will suffer irreparable harm if a status quo injunction is not granted, and because it is clear that the City has acted unlawfully, and because the public interest will be served by the granting of injunctive relief, this Court should grant appropriate injunctive relief requiring Defendants to restore Mr. Patterson's §111F benefits pending a due process hearing and the immediate submission of this matter to arbitration.

## II.    FACTS

1.    Plaintiff Stephen Patterson has been employed by the Defendant City of Woburn ("City") since 1975, when he began work as a full-time provisional fire fighter. He became a permanent reserve fire fighter for the City in September of 1979. He was appointed as a full-time permanent fire fighter in February of 1980. He has been assigned to the position of Fire Alarm Supervisor since 1993. Exhibit A, Affidavit of Stephen Patterson, dated October 15, 2004 ("Patterson Aff."), ¶1.

2.    In 1983, in the course of performing his duties as a fire fighter for the City,[1] Mr. Patterson injured his back and was out of work for approximately two weeks in 1983. During this period Patterson received injury leave benefits from the City pursuant to M.G.L. c. 41, §111F. Ex. A, Patterson Aff., ¶4.

3.    Mr. Patterson is a member of the Woburn Fire Fighters Association, Local 971, IAFF (the "Union"), which represents all of the fire fighters employed by the City.

4.    The Union and the City are parties to a collective bargaining agreement which provides in Article 3, Section 3 for a "Limited Duty Policy and Procedure." Exhibit B, Affidavit of David Peary, dated October 15, 2004 ("Peary Aff."), ¶¶3-4, Exhibit 1. This Limited Duty Policy and Procedure provides a procedure through which employees on §111F injury leave and unable to perform full fire fighting duty, can return to work under limited duty. Under this procedure, the City has the right to assign firefighter to the appropriate limited duty tasks and work schedule. Thus, Article 3, Section 3 of the parties' Agreement provides:

**Section -3- Limited Duty Policy and Procedure**

The intent of this policy is to provide a procedure and mechanism for employees who, although unable to perform full fire fighting duty, are capable of performing meaningful duties within the Woburn Fire Department; assigning them appropriate tasks and work schedules; . . . The purpose is to give the City the right to assign employees who have been injured on duty . . .

(e)    Limited duty shall consist of tasks assigned by the City, including but not limited to: dispatching, fire prevention inspections, education, training and/or administrative tasks. All assigned tasks shall be within the physical capabilities of the employee.

See, Ex. B, Peary Aff., ¶4, Ex. 1.

5.    The historic practice within the City's Fire Department has been that a fire fighter on injury leave does not return to work on limited duty until, pursuant to the collective

---

[1] Patterson injured his back while on a medical call when he was transporting an injured person out of a building to an ambulance. Ex. A, Patterson Aff., ¶4.

bargaining agreement, the City assigns the fire fighter to a limited duty position and notifies the fire fighter of the assignment and the date of his/her return to work. See, Ex. B, Peary Aff., ¶5; Exhibit C, Affidavit of David Fuller, dated October 15, 2004 ("Fuller Affidavit"), ¶3.

6.    Further, Pursuant to the collective bargaining agreement between the Union and the City, the Fire Department is required to post orders and notices at the Fire Department stations. Pursuant to this rule, the Fire Department has always posted a notice when a fire fighter is returning to limited duty, including his/her assignment and the date he/she will return to work. Pursuant to the collective bargaining agreement, copies of all general orders or notices must be sent to the President and Secretary of the Union and a copy must be posted in all stations. See, Ex. B, Peary Aff., ¶¶6-7, Ex. 1, Article 15, Section 1(b); Exhibits 2 and 3; Ex. C, Fuller Aff., ¶4.

7.    Further, the Shift Commanders, who are responsible for scheduling fire fighters on each shift, are also notified before a fire fighter returns to work on limited duty as to when the fire fighter is returning and his/her assignment and responsibilities. See, Ex. B, Peary Aff., ¶7; Ex. C, Fuller Aff., ¶4.

8.    On a number of occasions in the past, the limited duty procedure set forth above was followed when Mr. Patterson has been cleared by his treating or examining physician to return to work on limited duty. On each of these occasions, the physician's record clearing Mr. Patterson for light duty would be sent to the City and, thereafter, Mr. Patterson would receive either a telephone call or a letter from the City's Fire Chief indicating when he should return to limited duty and his specific assignment. For example, Mr. Patterson suffered a work-related injury to his femur and knee in 2000, when he fell and sustained a fractured femur and knee injury. As a result he was unable to work for a period of time and received injury leave benefits under M.G.L. c. 41, §111F. Ex. A, Patterson Aff., ¶¶6-7. Mr. Patterson was cleared to return to

4

work after a medical examination by Dr. William Patterson in September, 2000. Thereafter, on September 27, 2000, he received a letter from Defendant Fire Chief Paul Tortolano notifying him of the date he should return to work (October 2, 2000) and his assignment. Ex. A, Patterson Aff., ¶¶7, Ex. 1.

9.     Patterson has undergone various treatments for his back injury for a number of years. Ex. A, Patterson Aff., ¶5. In or around April of 2003, Patterson's back pain increased to the point where he was unable to work. Thereafter, he remained on 111F leave from April, 2003 until July, 2004. During this time, Patterson continued to undergo various treatments to try to alleviate his back pain. However, in approximately September of 2003, Patterson's treating physician, Dr. Frank X. Pedlow, a specialist at the Massachusetts General Hospital's Department of Orthopaedic Surgery, determined that Mr. Patterson had reached an endpoint in noninvasive treatments and recommended surgery. On February 10, 2004, Dr. Pedlow performed a fusion and decompression at L5-S1. Thereafter, Patterson began physical therapy. Ex. A, Patterson Aff., ¶¶8-9.

10.    On June 7, 2004, Dr. Pedlow determined that Mr. Patterson could return to work in July, 2004 to a "Limited Duty – Data Entry Position." Ex. A, Patterson Aff., ¶10, Ex. 2. Present at this visit was Linda Casale-Luz, a nurse manager employed by the City, who relayed this information to the City's Human Resources Department Director, Jan Cox. *Id.,*, Ex. 3.

11.    On July 7, 2004, one month after Patterson's doctor had submitted the note allowing Patterson to return to work, Defendant Fire Chief Paul Tortolano ("Chief Tortolano") sent Patterson a letter stating that "[a]ccording to your case manager your doctor has given his approval for your return to work on limited duty. You are to report to duty as dispatcher at Station #3 on Group #2 on July 12, 2004." Ex. A, Patterson Aff., ¶11, Ex. 4.

12.    Thereafter, Mr. Patterson spoke to Chief Tortolano and explained that Dr. Pedlow had only cleared him to return to limited duty in a "data entry position" and, therefore, he could not perform the dispatcher position the Chief had assigned him to.  Chief Tortolano agreed and told Mr. Patterson to report to work on July 12, 2004 and perform only data entry work.  Ex. A, Patterson Aff., ¶12.

13.    On July 13, 2004, Chief Tortolano posted a notice setting forth Mr. Patterson's date of return to work on a limited duty basis and his specific job responsibility on data entry only.  Chief Tortolano sent a copy of this notice to the Captains' office, the fire stations and the Union.  Ex. B, Peary Aff., ¶7, Exhibit 2.

14.    As set forth above, the procedure that was followed whereby the Fire Chief notified Mr. Patterson of his return to work and his assignment before he returned to work on limited duty in July, 2004, has been the historic practice within the Department.

15.    On July 12, 2004, Patterson returned to work in the position of data entry and worked in that position until August 18, 2004 when he began experiencing increased back pain and was unable to work.  Ex. A, Patterson Aff., ¶13.

16.    Thereafter, Patterson was out of work from August 18, 2004 until the present. During this period Patterson received injury leave benefits from the City pursuant to M.G.L. c. 41, §111F from August 18, 2004 until September 25, 2004, when the City discontinued Patterson's 111F benefits.  Ex. A, Patterson Aff., ¶¶14-15.

17.    On September 10, 2004, Patterson was examined by his treating physician, Dr. Pedlow, who determined that Patterson was able to return to work on that date with the following restrictions: "Light duty – no lifting/bending/prolonged sitting or standing."  Present at this

6

meeting was Linda Casale-Luz, the City's nurse manager, who apparently again relayed this information to the City. Ex. A, Patterson Aff., ¶16, Exhibit 5.

18.     Based on the historic practice within the Fire Department, Patterson's own prior experience in returning from injury leave to limited duty, and the provisions within the Collective Bargaining Agreement, after the September 10, 2004 note from Dr. Pedlow was submitted to the City, Patterson waited for the Chief to contact him as to when and where he was to return to work and his specific job assignment. Ex. A, Patterson Aff., ¶17.  Mr. Patterson had waited as long as a month in the past between the time he submitted medical documentation clearing him to return to limited duty and the Chief contacting him with his expected date of return and job assignment. Ex. A, Patterson Aff., ¶18.

19.     However, Patterson was not contacted by anyone from the City after September 10, 2004 as to when he should return to work or what limited duty assignment he would receive. Ex. A, Patterson Aff., ¶19.

20.     On September 30, 2004, without any prior notice from the Chief or any other City representative, Patterson received a letter from Chief Tortolano alleging that Patterson's absence from work "since September 10, 2004 is unauthorized based on your continued failure to report to work and your failure to advise me of any legitimate reason for your absence.  Accordingly, the Department will not authorize any payments to be made during this period of unauthorized absence."  Chief Tortolano's letter also maintained that "in accordance with M.G.L. c. 31, §38, please be advised that you are considered to have permanently and voluntarily separated yourself from employment with the City of Woburn Fire Department based on your failure to report for duty in excess of fourteen (14) days without authorization from the Appointing Authority."  Finally, Chief Tortolano's letter stated that "[y]ou may, within ten days after the mailing date of

this letter, request a hearing before the Appointing Authority to determine if there is any basis for your restoration of employment with the City of Woburn Fire Department or if there is a basis for your being granted a leave of absence. Otherwise you will be considered permanently and voluntarily separated from employment with the Woburn Fire Department." Ex. A, Patterson Aff., ¶20, Exhibit 6.

21.    Contrary to Chief Tortolano's letter, Mr. Patterson did not believe he was on an unauthorized absence from work as of September 10, 2004. Rather, because no one, including Chief Tortolano has contacted him to provide him with his date of return and job assignment, he understood that he was continuing on injury leave. Ex. A, Patterson Aff., ¶21.

22.    Shortly thereafter, Mr. Patterson provided Union President David Peary with a copy of Chief Tortolano's September 30, 2004 letter. Mr. Peary advised Mr. Patterson to request a hearing on this matter. Ex. B, Peary Aff., ¶¶8-9.

23.    On October 5, 2004, Patterson sent a certified letter to Chief Tortolano requesting a hearing before the Appointing Authority to contest the Chief's claim that he had been on an unauthorized absence since September 10, 2004. Ex. A, Patterson Aff., ¶22, Exhibit 7; Ex. B, Peary Aff., ¶10.

24.    On or about October 5, 2004, the President of the Union, David Peary, telephoned Chief Tortolano's office and spoke to the Chief's secretary. Mr. Peary stated that he wanted to meet with the Chief to determine if there was a misunderstanding as to Mr. Patterson's injury on leave benefits and/or his limited duty assignment and to confirm that Mr. Patterson would continue to receive his pay while the requested hearing was pending. Based on past experience, the Union believed that Mr. Patterson would be provided a hearing before his pay was terminated. The Chief's secretary told Mr. Peary that she would give the Chief Mr. Peary's

8

message.  Chief Tortolano never returned Mr. Peary's telephone call.  Ex. B, Peary Aff., ¶¶11-12.

25.    However, despite the fact that Patterson had requested a hearing, and Mr. Patterson's and the Union's belief that the City would comply with the law and not discontinue his pay until he received a pre-termination hearing, Mr. Patterson discovered that the City discontinued his pay as of October 7, 2004, the first pay date in which he did not receive his check.  That same day, Mr. Patterson informed Union President Peary that he had not received a paycheck.  Ex. A, Patterson Aff., ¶23; Ex. B, Peary Aff., ¶13.

26.    On October 13, 2004, the Union's counsel, Terence Coles, Esquire, spoke to the City's counsel, Nicholas Anastasopoulos, Esquire, and explained, *inter alia*, that Mr. Patterson was not on an unauthorized leave of absence, that his §111F benefits were continuing, and that Mr. Patterson should be entitled to a due process hearing before his benefits or pay were terminated.  Mr. Coles then sent Mr. Anastasopoulos an e-mail explaining the Union's position and relevant documents.  Exhibit D, Affidavit of Terence Coles, Esquire, dated October 16, 2004, ¶¶4-5, Exhibit 1.

27.    That same day, Mr. Anastasopoulos wrote back to Mr. Coles and stated that Mr. Patterson's hearing was scheduled for October 18, 2004.  Prior to this, Defendants had not informed either Patterson or the Union that a hearing was scheduled.  Ex. A, Patterson Aff., ¶24; Ex. B, Peary Aff., ¶14; Ex. D, Coles Aff., ¶6, Exhibit 1.

28.    Article 12 of the collective bargaining agreement between the Union and the City contains a grievance and arbitration process culminating in final and binding arbitration.  Ex. B, Peary Aff., Ex. 1.

29.    On or about October 14, 2004, seven days after determining that Mr. Patterson was no longer receiving §111F benefits from the City, Mr. Patterson and the Union filed a grievance on his behalf contesting the City's termination of his Section 111F benefits, the City's failure to provide Mr. Patterson with a limited duty assignment and the City's unjust termination of Mr. Patterson. Ex. A, Patterson Aff., ¶25, Exhibit 8; Ex. B, Peary Aff., ¶15. To date, Chief Tortolano has still not contacted the Union to discuss this issue. Ex. B, Peary Aff., ¶16.

30.    It will take at least one year for Mr. Patterson's grievance to move through the grievance and arbitration process. Ex. D, Coles Aff., ¶¶8-11.

31.    On October 14, 2004, Mr. Anastasopoulos sent Mr. Coles a letter stating that Mr. Patterson would not be provided with a due process hearing prior to the termination of his §111F benefits, his pay or his employment and that Defendants considered Mr. Patterson and the Union to have "waived their right to the grievance and arbitration proceedings." Ex. D, Coles Aff., ¶7, Exhibit 2.[2]

32.    Currently, Patterson is no longer receiving pay from the City. He currently has no income from which to support himself and his wife.[3] In addition, Mr. Patterson continues to receive physical therapy and medication treatment for his back injury and pain. If he loses his

[2]    As set forth in Mr. Anastasopolous' letter, Defendants claim that Mr. Patterson and the Union did not file a grievance contesting Defendants' actions in a timely fashion. However, as set forth in the attached affidavits, Mr. Patterson did not find out that he was no longer receiving §111F injury leave benefits until October 7, 2004, the first week he did not receive a paycheck. The Union then filed the grievance on October 14, 2004, well within the ten (10) days permitted under the collective bargaining agreement. Defendants' claim, that Mr. Patterson was on notice of the termination of his benefits prior to October 7, 2004 is meritless. Mr. Patterson requested a hearing on Defendants' claim that he was no longer entitled to his §111F benefits or his employment and he reasonably expected, based on the parties' past practice and his Fourteenth Amendment due process rights, that those benefits would not be terminated until his hearing was completed. That hearing is set for October 18, 2004. Accordingly, Defendants' argument is premised on the preposterous claim that Mr. Patterson should have known that Defendants would break the law and terminate his benefits before a hearing. In any event, regardless of the merits of Defendants claim, the matter of whether the grievance is procedurally arbitrable will be decided by the Arbitrator pursuant to the collective bargaining agreement between the City and the Union.

[3]    Patterson is separated from his wife and pursuant to an alimony agreement, provides her with $200/month and health insurance. Ex. A, Patterson Aff., ¶27.

health insurance, he will be unable to pay for health insurance for himself or his wife. In addition, his present physical limitations, in light of his education and limited work experience outside of fire fighting, effectively prevent him from gaining employment outside of the limited duty at the Fire Department which Defendants are refusing to provide to Mr. Patterson. Thus, without injunctive relief, Mr. Patterson would be forced to go without any source of income for an additional twelve months. Ex. A, Patterson Aff., ¶¶2, 3, 26.

## ARGUMENT

A.    **PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF BECAUSE DEFENDANTS VIOLATED HIS CONSTITUTIONAL RIGHT TO NOTICE AND A HEARING PRIOR TO THE TERMINATION OF HIS EMPLOYMENT AND/OR SICK LEAVE WITH PAY BENEFITS UNDER M.G.L. c. 41, SECTION 111F.**

Mr. Patterson was continuing to receive injury leave benefits under M.G.L. c. 41, §111F until September 25, 2004, when Defendants summarily terminated his benefits and his employment with the City's Fire Department. Pursuant to the well settled principles of constitutional law, Mr. Patterson had a property interest in both his injury leave benefits and his continued employment with the Fire Department and, accordingly, he was entitled to a due process pretermination hearing. This Court should enter a preliminary injunction ordering Defendants to continue Mr. Patterson's compensation and benefits until such a hearing is provided.

Under settled principles of constitutional law, once a legislature has conferred a property interest upon an individual by statute that property interest may not be subsequently terminated without appropriate procedural safeguards. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985). *See also, Kercado-Melendez v. Aponte-Roque,* 829 F.2d 255, 262 (1st Cir. 1987).

11

Due process requires a pretermination hearing when a person having a property interest in his employment is terminated. It is well established that this principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Loudermill, supra, Board of Regents v. Roth,* 408 U.S. at 569-570; *Perry v. Sindermann,* 408 U.S. 593, 599 (1972); *Fontana v. Commissioner of Metropolitan Dist. Com'n* 34 Mass.App.Ct. 63, 606 N.E.2d 1343 (due process requires a pretermination hearing when a person having a property interest in his employment is terminated, citing *Loudermill).*

Here, it is obvious that Plaintiff, a firefighter for the City, has a property interest in his continued employment. Thus, the Massachusetts Civil Service statute, M.G.L. c. 31, §43, an aggrieved employee can secure a hearing at the Civil Service Commission to challenge a serious adverse action by an appointing authority for lack of just cause. Similarly, the collective bargaining agreement between Plaintiff's Union and the City provides that "[t]he Fire Fighters covered by this Agreement shall retain their Civil Service rights now in effect as provided by Chapter 31 of the General Laws of Massachusetts. Finally, the City's Municipal Code provides that an employee "may be demoted or dismissed for just cause." Woburn Municipal Code, Title 2-32 (attached hereto as Exhibit E).

Nor can Defendants suggest that Plaintiff is not entitled to a pretermination hearing because he is charged with unauthorized absence or because he was given a post-termination hearing. It is well established that in cases where the public employer terminates an employee for unauthorized absence that employee is still entitled to a pretermination hearing. *Hudson v. City of Chicago,* 374 F.3d 554, 559-562 (7th Cir. 2004) (police department required under due process clause to notify officers that they were on unauthorized absence and offer them opportunity to justify or otherwise challenge their unexplained absences *before* terminating them

to the extent officers could have been contacted through reasonable effort such as telephone call or letter); *Sturgess v. Negley*, 761 F.Supp. 1089 (D. Del. 1991) (plaintiff police officers entitled to pretermination hearing where they were terminated for alleged unauthorized absence from work) As the district court stated in *Sturgess*, the public employer could not avoid providing an employee with a pretermination hearing simply by characterizing the employee's termination as an unauthorized absence or resignation. As the court observed, "this Court has previously rejected the argument of a town which treated an employee's "alleged unexcused absences as an implicit resignation," and held that "[a] public employer cannot circumvent its constitutional obligations by recharacterizing an employee's termination as a resignation." 761 F. Supp. 1089, 1094, *citing Meding v. Hurd*, 607 F. Supp. 1088, 1108 (D. Del. 1985). As the court stated:

> There can be no dispute that defendants did not provide plaintiffs with such notice and an opportunity to respond before plaintiffs were officially separated from their positions. Negley and Clower did not even contact plaintiffs to inquire as to the reasons for their absences, and the . . . letters do not offer plaintiffs a chance for each to present his side of the story before any decision would be final. The fact that plaintiffs were subsequently given a public hearing is insufficient, because the due process clause "requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

761 F. Supp. 1089, quoting *Loudermill*, at 470 U.S. at 542, quoting *Board of Regents v. Roth*, 408 U.S. 564, 569-570 (1972).

Further, Defendants failed to provide Mr. Patterson with due process prior to terminating his injury leave benefits under M.G.L. c. 41, §111F. M.G.L. c. 41, §111F creates a property interest in leave with pay for firefighters who are injured in the line of duty. *Chicklowski v. City of Springfield*, No. 94-30046-FHF, Slip Op. at 8-12 (D. Mass. July 12, 1995), Exhibit I; *Egan v. City of Northampton*, No. 95-30004-FHF, Slip Op. at 5 (D. Mass. Nov. 29, 1995), Exhibit J; *Cantoni v. City of North Adams*, No. 99-30278-FHA, Slip. Op. at 2 (D. Mass. May, 26, 2000),

Exhibit K.[4] Thus, prior to the termination of section 111F benefits, an individual must be provided due process of law.

While due process does not require a formal, evidentiary pre-termination hearing, some form of notice and an opportunity to present reasons why the proposed action should not be taken is required prior to the deprivation of a property interest. *Loudermill,* 470 U.S. at 545-546. *See also, Mathews v. Eldridge,* 424 U.S. 319, 343 (1976); *Moody v. Town of Weymouth,* 805 F.2d 30, 33 (1st Cir. 1986). Here, it is undisputed that Plaintiff had his M.G.L. c. 111F benefits terminated on September 25, 2004 without the opportunity to be heard.

Defendants' claim, that Mr. Patterson's visit with his own treating physician on September 10, 2004 provided him with "constitutionally adequate notice and an opportunity to be heard," lacks any merit. See, Ex. D, Coles Aff., Exhibit 2. Similarly, Defendants' reliance on the decision in *Mard v. Town of Amherst,* 350 F.3d 184 (2003) is absurd. *Mard* is inapposite to the instant matter in two respects. *Mard* only concerned the termination of the plaintiff's §111F benefits, not his termination from employment. Here, as set forth above, Plaintiff had *both* his employment *and* his 111F benefits terminated without any opportunity to be heard. Thus, the First Circuit itself distinguished the facts in *Mard* from a case where the plaintiff's employment is terminated without prior notice or hearing. 350 F.3d 184 at 189-190, citing *Kercado-Melendez v. Aponte-Rogue,* 829 F.2d 255, 263 (1st Cir. 1987) (due process violation where Department of Public Instruction dismissed school district superintendent without prior notice or hearing). Thus, even if Defendants are successful in their claim that Plaintiff's September 10, 2004 visit with his treating physician somehow satisfied his due process rights regarding his §111F

---

[4]    The statute provides in pertinent part, "Whenever a...firefighter of a city or town...is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own...he shall be granted leave without loss of pay for the period of such incapacity..." M.L.G. c. 41, § 111F.

benefits, that visit certainly did not put Plaintiff on notice that he would be terminated.

Accordingly, the *Mard* case is simply irrelevant to the undisputed fact that Plaintiff was denied

his due process right to a pre-termination hearing.

Second, Mr. Patterson's visit to his treating physician on September 10, 2004 is nothing

like the independent medical examination provided to the plaintiff in *Mard*. In *Mard*, the

firefighter receiving 111F injury leave benefits underwent an *independent medical exam*

arranged by the Town for the explicit purpose of determining whether her §111F benefits would

be terminated. Both the state statute and the collective bargaining agreement between Mard's

union and the Town of Amherst indicated that the purpose of a required independent medical

examination by a Town-designated physician was to evaluate an injured firefighter's continued

eligibility for §111F benefits. In addition, Mard was notified in writing as to the nature and

purpose of the independent medical examination and the potential that her 111F benefits could

be terminated.

Here, in contrast, Mr. Patterson visited his treating physician, not an independent medical

examiner. Critically, based on the historic practice within the Fire Department, the collective

bargaining agreement between the City and the Union, and Mr. Patterson's own experience, Mr.

Patterson understood that his §111F benefits would not be terminated simply because his treating

physician had cleared him to return to limited duty. Rather, Mr. Patterson had every reason to

believe that his §111F benefits would only be terminated after he was contacted by Chief

Tortolano and given a date to return to work and an assignment. This was the uniform practice

within the Fire Department and Mr. Patterson had no reason to believe that his return to limited

duty in September, 2004 would be any different. In sum, Defendants simply cannot claim that

Mr. Patterson was apprised of the termination of his benefits as a result of his visit to his treating physician on September 10, 2004.[5]

Accordingly, Mr. Patterson was entitled to a due process hearing before either his §111F benefits or his employment was terminated. Defendants did not provide this. Instead, on September 30, 2004, Chief Tortolano notified Mr. Patterson that he was on an unauthorized absence from work and that he was considered separated from employment. Despite the fact that Mr. Patterson then requested a hearing, Mr. Patterson found out on October 7, 2004 that Defendants had terminated his §111F benefits and all compensation as of September 25, 2004. As an initial matter, this Court should enter a preliminary injunction ordering Defendants to continue Mr. Patterson's §111F benefits and/or employment compensation and benefits until he is afforded a hearing. As set forth below, the Court should further enter a preliminary injunction requiring Defendants to continue this compensation and benefits pending the resolution of Mr. Patterson's claim for injury leave benefits and/or limited duty through expedited binding arbitration.

**B.    PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF RESTORING THE STATUS QUO PENDING RESOLUTION OF HIS CLAIM FOR INJURY LEAVE BENEFITS OR LIMITED DUTY THROUGH BINDING EXPEDITED ARBITRATION.**

Not only has the City terminated Mr. Patterson's injury leave benefits, but moreover it has refused to assign him to limited duty pursuant to the collective bargaining agreement and then terminated him on the trumped of charge of unauthorized absence from work. Now it is

---

[5] Indeed, the collective bargaining agreement between Plaintiff's Union and the City of Woburn allows for the City to "arrange for a medical evaluation regarding the length and extent of disability, including an opinion as to the ability of the employee to perform limited duty." Article 3, Section 3 (2), Procedure. Here, it is undisputed that Plaintiff's visit with his treating physician was not a "medical evaluation" set forth in the collective bargaining agreement. Rather, Plaintiff's only understanding after his visit was that sometime thereafter he would be contacted by the Chief and assigned a limited duty position. He was never put on notice that his 111F benefits would be terminated if he did not return to work. In fact, it is undisputed that the City never notified him of when he was supposed to return to work and never attempted to contact him after they believed he was supposed to return to work.

claiming that Mr. Patterson is not even entitled to utilize the grievance and arbitration procedures in the collective bargaining agreement to contest these actions. Thus, Mr. Patterson is faced with an urgent financial situation. The resolution of this case could potentially take over one year if the parties do not engage in expedited arbitration. In the meantime, for so long as he remains disabled, Patterson will be without any appreciable income and without the means to obtain the necessities of living. Compounding the plaintiff's precarious situation is the fact that he continues to receive medical treatment for his back injury, treatment that will be jeopardized if his medical benefits are terminated.

The Union has filed a grievance on behalf of Mr. Patterson, with respect to the City's termination of his injury leave benefits under §111F, its refusal to allow him to return to limited duty under the collective bargaining agreement, and its unjust termination of his employment Based on past experience, it will take approximately one year to move through the steps of the grievance process, schedule the matter for arbitration, and then try, brief and have a final decision on this arbitration. See, Exhibit D, Coles Aff., ¶¶8-11. Meanwhile, Mr. Patterson will be without any income or insurance for himself or his wife. Moreover, as reflected in Dr. Pedlow's medical note of September 10, 2004, Mr. Patterson is able to perform only light duty work and he is restricted from performing any work requiring lifting, bending, or prolonged sitting or standing. Those restrictions, of course, exclude almost all other employment. In addition, Mr. Patterson's limited education (a GED in 1971) and limited experience outside of fire fighting (as a welder in the mid-1970's and operating a mobile canteen in the mid-1970's and early 1980's) effectively render him ineligible for any real employment while this matter proceeds through the grievance and arbitration process. Thus, the need for injunctive relief is clear.

Because defendant City has refused to grant plaintiff benefits under §111F or place him on limited duty, the City has placed plaintiff and his family in a financially catastrophic position. In such circumstances, Massachusetts courts repeatedly have granted preliminary injunctive relief under Chapter 41, §111F, to prevent the improper withholding of injury leave benefits.[6]

In *Calvo v. Everett Board of Fire Commissioners*, C.A. No. 88-366 (Superior Court 1988) (copy attached as Exhibit F), the presiding justice issued a preliminary injunction enjoining the defendant from terminating plaintiff's injury leave benefits. The court found that injunction was necessary because of the risk of irreparable injury:

> [T]he risk of irreparable injury cuts in plaintiff's favor. Plaintiff's paid leave is the primary source of income for his family. ... The discontinuance of plaintiff's paid leave would irreparably injure him.

(Exhibit F, p. 4).

Similarly, in *Ceballos v. Police Chief, Falmouth Police Department*, No. 88-112 (Super. Court. 1988) (copy attached as Exhibit G), the court found that the plaintiff had no remedy at law because he had exhausted his sick leave and vacation time. The court found irreparable harm to the plaintiff in the deprivation of salary during a period of disability. Balancing the risk of injury to the plaintiff and the small risk to the defendant, the court enjoined the Town of Falmouth from stopping plaintiff's injury leave benefits under §111F. In the case of *Mucci, et al. v. City of Chelsea*, CV-85774 (Super Ct. 1987) (attached hereto as Exhibit H), the court issued a preliminary injunction when the City of Chelsea court off the plaintiff's §111F benefits and

---

[6] In *Brookline v. Goldstein*, 388 Mass. 443, 447 (1983), the Supreme Judicial Court defined the standard for issuance of a preliminary injunction. The judge must evaluate 1) the plaintiff's claim that he will suffer irreparable harm if the injunction is denied; 2) the injury to the defendant if the injunction is granted; 3) the likelihood of success on the merits; and 4) the public interest. Likelihood of success on the merits should be balanced against relative risk of harm to the parties and the public, therefore the greater the chance of success the less harm need be demonstrated. *Id.*, citing *Packaging Industries v. Cheney*, 380 Mass. 609, 617 (1981).

placed him on sick leave. The court ordered the City to restore the plaintiff to injury leave status pursuant to §111F.

Based on the above cases, it is clear that the courts will enter injunctive relief preventing the improper withholding of §111F benefits, in order to prevent irreparable harm, so long as plaintiff can show 1) that he will lose his only source of income and benefits, and 2) that he has a reasonable likelihood of succeeding on the merits of his claim.

### 1.    Mr. Patterson's Loss Of His Income From The City Will Cause Irreparable Harm.

The evidence demonstrates that Plaintiff's loss of §111F benefits will have a devastating effect on his ability to provide for himself and his wife. As set forth in Mr. Patterson's affidavit and the attached medical records, Mr. Patterson is currently unable to perform the job of fire fighter. Rather, his treating physician has allowed him to return to work on light duty with the following restrictions: no lifting, bending or prolonged sitting or standing. As such, if the City is allowed to discontinue Mr. Patterson's 111F benefits, his severely limited ability to perform work will effectively operate to prevent him from working. Further, as set forth in Mr. Patterson's attached affidavit, he is currently undergoing physical therapy and treatment for his back injury. If the City is allowed to terminate his §111F benefits, he will be unable to afford the health insurance necessary to continue this critical therapy and treatment. Accordingly, Mr. Patterson is at risk of seriously jeopardizing the limited gains he has made in alleviating his back injury and pain. Further, as set forth in Mr. Patterson's attached affidavit, he and his wife have an alimony agreement that requires Mr. Patterson to pay $200/month to his wife and provide her with health insurance. Accordingly, if the City is allowed to terminate his 111F benefits, Mr. Patterson will be left with no ability to provide this compensation and health benefit to his wife.

19

**2.    Because Mr. Patterson Is Almost Certain To Prevail On The Merits Of His Underlying Claims, Injunctive Relief Is Appropriate.**

Because it is almost certain that Mr. Patterson will prevail on his claims, injunctive relief to maintain the status quo is appropriate.  As shown below, Mr. Patterson asserts three separate claims in his grievance, each of which he is likely to prevail upon: (1) the undisputed medical evidence establishes that Mr. Patterson cannot return to duty as a full-time firefighter and therefore he is entitled to §111F benefits; (2) the undisputed medical evidence demonstrates that Mr. Patterson could perform the limited duty authorized by his treating physician and therefore, if Defendants wish to cease paying Mr. Patterson's §111F benefits, they must offer and assign him to limited duty; (3) Mr. Patterson was terminated from §111F benefits and his employment with the City without notice and an opportunity to be heard in violation of the due process clause of the United States and Massachusetts Constitution.  The evidence related to the final claim, that Mr. Patterson was denied his due process rights, is set forth in the preceding section.  Each of the other claims are discussed below.

**a.    Plaintiff is entitled to receive §111F benefits from the City.**

M.G.L. chapter 41, §111F provides benefits to police officers and firefighters who are injured on the job.  The statute provides in relevant part:

> Whenever a police officer or fire fighter of a city, town, or fire or water district is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own ... he shall be granted leave without loss of pay for the period of such incapacity; provided, that no such leave shall be granted for any period after such police officer or fire fighter has been retired or pensioned in accordance with law or for any period after a physician designated by the board or officer authorized to appoint police officers or fire fighters in such city, town or district determines that such incapacity no longer exists.

M.G.L. c. 41, §111F. In this case, the plaintiff was "incapacitated for duty because of injury sustained in the performance of his duty" as a City fire fighter. Therefore, he is entitled to be paid pursuant to §111F until his "incapacity no longer exists."

While M.G.L. c. 41, §111F allows that a fire fighter may be ineligible for §111F benefits if he is capable of performing some fire fighter duties, a fire fighter does not lose his §111F benefits until the city assigns him back to work on those limited duty assignments. *Newton Branch Massachusetts Police Association v. City of Newton*, 396 Mass. 186 (1985). In *City of Newton*, the court held that §111F allowed a chief of police the right to "assign an officer who may be incapacitated for purposes of performing one type of police duty to another which he is fully capable of performing." Further, "[i]f a police officer is not incapacitated from performing any one of the duties to which he might be legally assigned, he is required to perform that duty or forfeit his right to paid accidental disability leave under M.G.L. c. 41, §111F." 396 Mass. at 192. However, the City must assign the officer to such limited duty before he loses §111F benefits. *Id.*

Here, the facts demonstrate that Mr. Patterson was entitled to receive §111F benefits until he was offered a limited duty assignment by Defendants. Here, the undisputed medical evidence demonstrates that Mr. Patterson is still incapacitated from performing the duties of a full-time fire fighter. Thus, Mr. Patterson's treating physician opined as of September 10, 2004 that Mr. Patterson could only return to work on "light duty," and with the following restrictions: no lifting, bending, or prolonged sitting or standing. Clearly, Defendants will not dispute that Mr. Patterson is currently unable to perform the duties of a full time fire fighter, duties which clearly include lifting, bending and prolonged standing. Further, it is undisputed that Mr. Patterson

could only return to work in the limited duty capacity provided for in the collective bargaining agreement.

Further, the facts demonstrate that Mr. Patterson was never offered a limited duty assignment after he went on injury leave on August 18, 2004 and began receiving §111F benefits. Thus, although the Chief was provided with Dr. Pedlow's note clearing Mr. Patterson to return to light duty, the Chief never contacted Mr. Patterson with his assignment and expected date of return. Further, even after Defendants were apprised of the fact that the Chief had never assigned Mr. Patterson to limited duty at any time during September, 2004, they refused to offer him limited duty. Accordingly, Mr. Patterson's right to paid accidental disability leave under §111F continues to this day.

Defendants' response to this clear set of facts is to argue that Mr. Patterson should have somehow known that he was required to return to work after his treating physician authored a note clearing him to return to light duty. More specifically, counsel for Defendants has claimed that Chief Tortolano's letter of July 7, 2004 "placed Firefighter Patterson on notice as to his assignment" and he should not have expected to receive another letter from the Chief after he again went on injury leave on August 18, 2004   See, Ex. D, Coles Aff., Exhibit 2.  However, Defendants argument is contracted by overwhelming evidence.

First,  First, the City asserts that Plaintiff should have returned to work on September 10, 2004 simply based on  his doctor's note allowing him to return to light duty as of September 10, 2004. However, as set forth in the attached affidavits, the historic practice within the Department has been that a fire fighter does not return to light duty *until after* he receives an assignment from the Chief setting forth when the fire fighter should return to work, his assignment, and his job responsibilities. Accordingly, a fire fighter is not expected to return to work simply because his

treating physician says he is fit to return to limited duty. He waits until he receives an assignment from the Chief. Here, it is undisputed that neither Chief Tortolano, nor anyone else in the Fire Department, ever contacted Mr. Patterson to give him his date of return or his job assignment.

Second, Plaintiff's own experience with the City and the Chief during June/July of 2004 conformed to the historic practice. Thus, Plaintiff visited his treating physician on June 7, 2004 and his physician signed a note that allowed Plaintiff to return to work on limited duty as of July, 2004. However, Plaintiff did not return to work on July 1, 2004. Rather, he waited until he received a letter from the Chief, dated July 7, 2004, assigning him to duty as dispatcher on July 12, 2004. Importantly, nowhere in the Chief's July 7, 2004 letter is there any suggestion that Plaintiff was somehow remiss in failing to report to work earlier.

Third, the collective bargaining agreement between the Plaintiff's Union and the City provides that an fire fighter is entitled to limited duty only if the City *assigns* such limited duty. The City generally retains the "right to assign employees who have been injured on duty" and the procedure set forth in the collective bargaining agreement explicitly states that an employee "may be assigned by the City to limited duty." More explicitly, the procedure sets forth in subsection (e) that "[l]imited duty shall consist of tasks assigned by the City, including but not limited to: dispatching, fire prevention inspections, education, training and/or administrative tasks." Accordingly, Patterson reasonably relied on his past experience and the provisions of the collective bargaining agreement in awaiting the Chief's contact before returning to limited duty.

Fourth, to the extent the Chief believed that Mr. Patterson should be back at work as of September 10, 2004, he failed to make any effort to contact Mr. Patterson after September 10, 2004 to find out why he was not at work. Thus, even if Defendants' claim that Mr. Patterson

should have known he needed to return to work on September 10, 2004 is accepted, neither the Chief nor anyone else in the Fire Department or the City made any effort to contact Mr. Patterson after September 10, 2004. All it would have taken was a simple telephone call or letter to Mr. Patterson asking why he was not at work. Instead, the Chief essentially set a trap and sat silently until September 30, 2004 before he wrote a letter to Mr. Patterson stating that he was on an unauthorized absence of more than fourteen days and considered to be separated from employment.

Fifth, nothing in Chief Tortolano's July 7, 2004 letter to Mr. Patterson would alert him to Defendants' expectation that if he went out on injury leave again, he should return to work after he received the okay from his physician but *before* he heard from Chief Tortolano. Rather, like all of the prior notices fire fighters had received from the fire chief informing them of their expected date of return and assignment, Chief Tortolano's July 7, 2004 letter simply stated that Mr. Patterson should report to work on July 12, 2004 and perform dispatching work at Station #3 on Group #2. It made no mention whatsoever of the procedures Mr. Patterson should follow if he went on injury leave again. In sum, Mr. Patterson had every reason to believe that the uniform past practice would continue and, after he received the okay to perform light duty from his doctor on September 10, 2004, he waited for Chief Tortolano to contact him with his assignment and date of return, a contact that never came.

Sixth, Defendants claim that Mr. Patterson should have known that he needed to return to light duty on September 10, 2004 is belied by Chief Tortolano's own failure to take any of the usual steps to inform the Department or the Union of Mr. Patterson's return. Thus, as set forth above, pursuant to the collective bargaining agreement and the parties' past practice, the fire chief has always posted notices informing the fire stations and the shift commanders of a fire

fighter's expected return to limited duty and his/her assignment. This is important so as to allow the shift commanders to know who they should schedule for work assignments and any limitations on the fire fighter's assignment. In addition, pursuant to the collective bargaining agreement, the Union is provided a copy of this notice. For example, when Mr. Patterson returned to limited duty in data entry in July, 2004, Chief Tortolano sent out just such a notice to the stations, the shift commanders, and the Union.

Here, it is undisputed that Chief Tortolano never sent or posted any such notice in or around September 10, 2004, or anytime thereafter, stating that Mr. Patterson was returning to work on September 10, 2004 on limited duty. Of course, by doing so, Chief Tortolano was assured that none of the Shift Commanders would know that Mr. Patterson was expected back at work and, when he did not show up, call him to see why he was not present. This underscores Chief Tortolano's real motive, to not notify anyone, including Mr. Patterson, of his expected return to work and then present specious charges of job abandonment. Clearly, Defendants have no right to expect Mr. Patterson to know that he should have returned on September 10, 2004 or anytime thereafter, when no one in the entire Fire Department, including, apparently, the Fire Chief himself, had such an expectation.

In sum, the evidence is clear that Mr. Patterson continued to be entitled to §111F benefits from August 18, 2004 to the present and Defendants unlawfully discontinued those benefits as of September 25, 2004.

### b. Mr. Patterson Is Entitled To A Limited Duty Assignment Pursuant To The Collective Bargaining Agreement.

As set forth above, the collective bargaining agreement provides for a procedure through which fire fighters are assigned limited duty. The evidence demonstrates that Mr. Patterson complied with this procedure on September 10, 2004, by securing a note from his treating

25

physician stating that he could return to limited duty. Pursuant to the provisions in the collective bargaining agreement, the Fire Chief should now determine if limited duty is available to Mr. Patterson with his present restrictions and assign him to that limited duty. As set forth above, the evidence is clear that from September 10, 2004 to the present the Defendants have unlawfully failed to assign Mr. Patterson to limited duty and compensate him accordingly.

## CONCLUSION

Based on the reasons set forth herein, and based on the affidavits and exhibits attached hereto, this Court should order interim injunctive relief ordering the Defendants to provide Mr. Patterson with a due process hearing and to restore Mr. Patterson's injury leave benefits pending binding arbitration of this matter.

Respectfully submitted,

STEPHEN PATTERSON and WOBURN
FIRE FIGHTERS ASSOCIATION,
LOCAL 971, I.A.F.F.,
By their attorneys,

Dated: October 20, 2004

Terence E. Coles, BBO #600084
Pyle, Rome, Lichten, Ehrenberg
& Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

## CERTIFICATE OF SERVICE

This is to certify that on October 20, 2004, a copy of the foregoing document was served by facsimile and overnight delivery upon:

Nicholas Anastasopoulos, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608

Terence E. Coles, Esq.

26