Exhibit 7

# ROBERT R. PENNELL, M.D., P.C.
## 225 BOSTON STREET
## LYNN, MASSACHUSETTS 01904

TEL. (781) 593-5430
FAX (781) 593-6149

BOARD CERTIFIED ORTHOPEDIC SURGEON

MEDICAL EVALUATION SPECIALIST

Sterling Acres Medical Arts Building
23 Worcester Road, Route 12
Sterling, Massachusetts 01564
(978) 422-8121

Reply to: LYNN OFFICE

October 8, 2003

Ms. Linda Casale-Luz
Medical Case Management
P.O. Box 775
Natick, MA 01760

Employee: Stephen Patterson
Date of Report: October 8, 2003

The patient is a 50-year-old man. He has worked as a firefighter for the City of Woburn Fire Department for 26 ½ years. Prior to that he was the owner/operator of a canteen truck for 3 ½ years. Before that he worked doing welding and metal fabrication for five years. Before that he was on active duty in the Navy for two years as a radio operator.

He has a G.E.D. and multiple college credits. He also took an EMT course. He is divorced and lives alone in his own home.

Around age 9 he had surgery for an inguinal hernia. Around 1975 he suffered a dislocation of his left shoulder at work. Around 1978 he had a dislocation of his right shoulder while water skiing. Neither was repaired. On 7/16/00 he had a trip and fall at work and landed on the front of the right knee. This resulted in a non-displaced intercondylar fracture of the distal femur. It was treated with a splint.

Except as noted below, he, otherwise, enjoyed good health. He never had any other significant injuries, accidents or orthopedic problems. He had no injuries at home, at work, playing sports or in car accidents.

## PATTERSON, Stephen

He reports that in 1981 he was working the ambulance, and he had to move a 425-pound lady down a flight of stairs. As he did this, he experienced sudden pain, which he indicates as being at the lumbosacral juncture in the midline. He reports having only back pain and no leg symptoms. X-rays were done, and he returned to work at the end of two weeks.

He then continued to do well until 1983 when he suffered an identical injury when moving the same woman down the same flight of stairs. Following this incident, he did reportedly have the onset of left lower extremity symptoms. The leg symptoms were said to begin in the left buttock and run down the back of the left thigh, the back of the left calf, the bottom of the left foot and then a "dime" size spot on the top of his forefoot.

He reports that he began treating with a chiropractor in Methuen for these back and leg symptoms. He reports that he would return to this chiropractor periodically for flare-ups of his back and leg symptoms.

He reports suffering a new injury to his back at work in 1993 while lifting a heavy piece of fire fighting apparatus. At that time, he was out of work for a few weeks, and he had physical therapy and took Motrin.

He reports a gradual worsening of his symptoms ever since 1993. In 1996 he consulted Dr. Roth, a neurosurgeon, and a CAT scan was done. According to an office note of 7/25/01, the CAT scan showed "a very small right paracentral disc herniation at L5-S1, which touches the traversing S1 nerve root on the right."

If correct, the CAT scan would fail to explain his left lower extremity symptoms, which were on the wrong side. Perhaps that is why Dr. Roth told him that he did not meet the criteria for an operation, and instead Dr. Roth told him to continue with his chiropractic treatment.

He reports that because of the progressive worsening of his symptoms, he then sought further treatment. On 7/25/01 he consulted Dr. Jouve.

On 7/25/01 Dr. Jouve noted a complaint of low back pain that radiated down the back of the left thigh and the back of the left calf in an S1 dermatome. There was numbness in the same distribution.

Dr. Jouve noted that Mr. Patterson remained at work on a full time, full duty basis and that he was able to engage in his recreational activities of going to the gym, golfing, snow mobiling and riding a motorcycle.

On examination Dr. Jouve found that Mr. Patterson's lumbar spine had a better than average range of motion. Perhaps more significantly, Dr. Jouve found that straight leg raising was possible to 105 degrees on the left "without discomfort." That is the straight leg raising did not aggravate the low back pain nor did it even reproduce or aggravate the leg symptoms.

PATTERSON, Stephen

Mr. Patterson was also reporting identical symptoms in the right lower extremity, but the right lower extremity symptoms were said to be milder than the left lower extremity, and straight leg raising on the right side was possible to 110 degrees and also failed to produce any discomfort either in the back or in the leg.

Instead, Dr. Jouve found that it was the femoral stretch test, which produced some back pain, and this would not seem to be appropriate, since Mr. Patterson had been able to achieve 35 degrees of lumbar extension without discomfort.

Dr. Jouve did order a lumbar MRI scan, and that was performed on 8/10/01. It was interpreted by the radiologist as showing some loss of signal from the L4-5 and L5-S1 discs. There was said to be some bulging of the annular ligament at L4-5. There was said to be narrowing of the L5-S1 disc with some concentric bulging of that disc. The radiologist did not report seeing any herniations or nerve root compression.

On 8/15/01 Dr. Jouve confirmed that the MRI scan showed only "mild" degenerative disc changes at L4-5 and L5-S1 and that there was "no evidence of disc herniation, canal stenosis or neuroforaminal stenosis." There was nothing to explain radicular symptoms in either lower extremity.

Consistent with the above, on 8/15/01 Dr. Jouve noted that there were no neurological deficits on examination.

Dr. Jouve referred Mr. Patterson to The Occupational Health Center of Waltham for a work hardening program. Mr. Patterson reports that he "went through the motions", but did not feel he really needed the treatment because he already had good back strength as the result of working out at his gym. He says that this therapy program did not really help.

On 9/25/01 Dr. Jouve noted that "his pain is unchanged." However, he recommended a continuation of physical therapy.

On 10/23/01 Dr. Jouve noted that Mr. Patterson was complaining of increased pain in the back of the left thigh in an S1 dermatome. However, in spite of allegedly having worsened radicular symptoms, his neurological examination continued to be 100% normal and it was possible to do 110 degrees of straight leg raising on the left, and this only caused back and buttock discomfort. It was not possible to reproduce or aggravate any of his radicular symptoms.

Dr. Jouve did prescribe a Medrol Dosepak. On 12/14/01 he noted that this had resulted in only "slight benefit for less than one week."

On 12/14/01 Dr. Jouve noted that Mr. Patterson continued to allege radicular symptoms in the back of his left lower extremity in an S1 dermatome. Then he ordered a nerve block of the left L5 nerve root. This does not appear to make sense. The nerve block was being directed at a nerve root that was not producing any symptoms.

PATTERSON, Stephen

Mr. Patterson underwent a nerve block of the left L5 nerve root on 12/26/01. On 1/4/02 Dr. Jouve noted that "his symptoms did not improve" as a result of the injection, and that might be understandable.

On 1/4/02 Dr. Jouve noted that Mr. Patterson continued to allege sciatic symptoms in an S1 dermatome in the back of his left buttock, thigh and calf. However, straight leg raising still failed to reproduce or aggravate his sciatic symptoms in either extremity.

On 1/4/02 Dr. Jouve noted that Mr. Patterson "expresses pain behaviors with range of motion and straight leg raise." However, he fails to explain that statement. He did, however, prescribe another course of oral steroids.

On 1/11/02 Dr. Jouve noted that this time the steroids "improved his symptoms by about 30%." He then discharged Mr. Patterson.

Mr. Patterson says that he then sought another opinion. He consulted Dr. Pedlow, an orthopedic surgeon.

He was apparently first seen by Dr. Pedlow on 3/18/02. It is not know what symptoms or physical findings he had at that visit. However, Dr. Pedlow did order a discogram.

A discogram was performed on 3/19/02. This was done at the L3-4, L4-5 and L5-S1 levels. The actual report from the procedure is not available, but a doctor's note of 6/23/03 indicates that no pain was produced when the L3-4 or L4-5 discs were injected, and injecting the L5-S1 disc only produced "mild" pain.

When he is seen today, Mr. Patterson disputes that interpretation of the discogram. He says that he was "screaming and grabbing the railing on the gurney" throughout the procedure.

The CAT scan report following the discogram indicates that the L3-4 disc was normal and that there was diffuse degeneration of the L4-5 and L5-S1 discs with some osteophytes at the L5-S1 level extending into the neuro foramen on each side.

On 5/22/02 he was seen by Dr. Stojanovic at a pain clinic. At that time Dr. Stojanovic noted a significant alteration in Mr. Patterson's leg symptoms. Dr. Stojanovic noted that Mr. Patterson was complaining of radicular pain that started in his buttocks and went "into the lateral aspect of his leg, calf and foot." And, reportedly, there was decreased sensation in the same locations. In other words, Mr. Patterson's symptoms had gone from an S1 dermatome in the back of his thigh and calf into an L5 dermatome on the lateral side of his thigh and calf.

As if to confirm this, on examination, Dr. Stojanovic found there to be a reported decreased sensation on the top of the foot and the lateral aspect of the calf in an L5 dermatome.

PATTERSON, Stephen

This was no mistake, and on 9/12/02 even Dr. Pedlow noted that Mr. Patterson's pain had changed location. He noted that Mr. Patterson's leg pain extended "into the lateral calf."

Even though Mr. Patterson continued to allege sciatic symptoms into both lower extremities, forward bending through the waist continued to be full and normal and without symptoms and definitely did not produce or aggravate any sciatic symptoms.

A new lumbar MRI scan was performed on 9/17/02. This was interpreted by the radiologist as showing no interval change. There continued to be a "small" posterior bulge of the L4-5 disc and a "small" broad posterior bulge of the L5-S1 disc that might make slight contact with the S1 nerve roots.

Thus, there had been a change in Mr. Patterson's radicular complaints without there being any interval change in his MRI scan. Also, the MRI scan showed no plausible explanation for symptoms in an L5 dermatome on the lateral sides of his calves.

Dr. Stojanovic apparently also noted these inconsistencies, and on 12/9/02 he noted that Mr. Patterson's "history is not quite consistent with discogenic pain." He also noted that Mr. Patterson had gone back to having leg symptoms in an S1 dermatome.

On 12/9/02 Dr. Stojanovic performed a left trans foraminal epidural steroid injection at the L4-5 level. He injected dye along with the Novocaine and cortisone, and he noted that the dye spread along the left L5 nerve root.

This is significant because Mr. Patterson was no longer claiming symptoms in an L5 dermatome. Beyond that, when he is seen today, Mr. Patterson states that this trans foraminal epidural steroid injection at the L4-5 level relieved "everything" for a couple of hours or as long as the Novocain lasted.

This is very important because in claiming that this single injection relieved "everything" he was stating in a loud voice that his symptoms were coming from the L5 nerve root when clearly they were not.

Just as importantly, when the same nerve root had been injected on 12/26/01, he denied getting any relief at all. If anything, he claimed that the injection made him worse.

Mr. Patterson reports that subsequently all of his symptoms became progressively worse, and he then stopped working on 4/14/03.

It clearly was not his job that made his symptoms worse because when he is seen today he says that his condition "has gotten worse" since he stopped working six months ago.

PATTERSON, Stephen

On 5/21/03 he was again seen by Dr. Stojanovic. At that time Dr. Stojanovic noted that Mr. Patterson's leg pain was "in the S1 distribution" in both lower extremities and was worse on the left.

Dr. Stojanovic also noted that Mr. Patterson had added some new symptoms. He was now said to be complaining of numbness and weakness in both legs and giving out of both knees.

Also, for the first time, Dr. Stojanovic noted that Mr. Patterson was now walking with a limp. And, for the first time, straight leg raising was said to be positive on the left side at 50 to 60 degrees.

However, this was immediately contradicted by Dr. Stojanovic's notation that Mr. Patterson had 90 degrees of forward bending through the waist.

There is also the suggestion that Mr. Patterson may have been engaging in some inappropriate pain behavior, as Dr. Stojanovic also found the Patrick's test to be positive on both sides. Patrick's test is for arthritis of the hip joint and should not have been positive.

Dr. Stojanovic fails to indicate what he means by positive straight leg raising. He fails to state whether it caused back pain or leg pain. And if it did reproduce Mr. Patterson's leg pains, he does not say what dermatome they were in.

Consistent with the fact that Mr. Patterson was engaging in pain behavior on 5/21/03, when he was examined by Dr. Tromanhauser one month later, the examination was very different. On 6/23/03 Dr. Tromanhauser noted that Mr. Patterson "walks without difficulty" and the limp had disappeared. Dr. Tromanhauser also found that Mr. Patterson's "hips have good range of motion without discomfort" and the Patrick's test was now completely normal.

Dr. Tromanhauser also found that Mr. Patterson's lumbar spine had a full range of motion. There was full flexion and full extension.

Dr. Tromanhauser reviewed a new MRI scan of 3/25/03, and he noted that "no obvious neuro compressive lesion is seen." That is, he did not find anything that would explain radicular or sciatic symptoms in either lower extremity in any dermatome.

On 7/2/03 Dr. Stojanovic performed nerve blocks on the facet joints on the left side of Mr. Patterson's back. This is very important because following these facet blocks Mr. Patterson says that the result was "same as the other" referring to the intra foraminal injection of 12/9/02. He says that the injection of 7/2/03 again gave him "short relief for a couple of hours," and it gave him "good relief" of both his back and his leg symptoms.

PATTERSON, Stephen

Thus, Mr. Patterson is stating in a loud voice that numbing his facet joints can eliminate his back and leg pain. And then doing an injection inside the spinal canal to the L5 nerve root can also eliminate his back pain and his leg pain. None of this makes physiological sense. The identical pain could not be caused by both the L5 nerve root and the facet joints. Also, an L5 nerve root would not be expected to cause back pain, although it could produce leg pain. The facet joints might be expected to produce back pain. They would not produce leg pain. Thus, it also is not appropriate that each of these injections should be able to both eliminate his back pains and his leg pain.

On 7/23/03 Dr. Stojanovic confirmed that Mr. Patterson achieved "significant pain relief for several hours on 7/2/03" as a result of the injection. And the injection of his facet joints relieved both the back pain and the leg pain.

On 8/13/02 Dr. Stojanovic did a repeat block of the facet joints on the left side, and Mr. Patterson, again, claimed to have very good pain relief. His pain reportedly went from a 5 to a 1 in terms of severity.

This response to the facet block is also very important because in claiming great pain relief from the facet blocks, Mr. Patterson is stating, in a loud voice, that his pain was not coming from the lumbar discs or from nerve root compression.

He reports that about three months ago he sought yet one more opinion. This time he consulted Dr. Eichler, and Dr. Eichler recommended doing a CAT scan, a bone scan and an EMG. Mr. Patterson reports that these studies showed that he had a "fracture" in his spine, and Dr. Eichler wanted to treat him with a body cast or brace.

As a result of his responses to the facet blocks, Dr. Stojanovic wanted to do a radio frequency burning of the nerves to the facet joints on the left side of his back. However, Mr. Patterson says that he cancelled that procedure.

He reports that he has been informed that he will eventually require a spinal fusion, but before that he might undergo other surgical procedures, possibly to include a laminectomy or some other procedure.

When he is seen today, Mr. Patterson reports that he has "gotten worse" since he stopped working. He complains of continuing low back pain and symptoms in both lower extremities. He also presently is taking Ibuprofen and Ultracet for his symptoms.

He complains of low back pain, and he is asked to indicate the area of the pain. He then points to the mid point of his sacrum, and the area is marked with a pen. He is asked to confirm that this is the area of his pain, and he agrees that it is.

PATTERSON, Stephen

The center of his pain is then determined to be at the upper end of the buttock crease and, on direct measurement, is 4 inches below the level of his iliac crests. Since the iliac crests are level with the bottom of L4, his pain clearly has nothing at all to do with the lumbar spine.

He does say that this pain at the mid point of his sacrum by S3 radiates downwards and to right and left towards the right and left buttocks. The pain is constant.

He then goes on to say that he actually has two different pains in his lower back. One is a constant pain, and the other is a sharp pain.

He says that the constant pain is always there, and he can think of nothing at all that makes the pain better or worse.

This is felt to be unusual, since he is alleging a mechanical problem, and his response to the facet joint injections indicates that he is alleging the pain as coming from the facet joints. And, yet, the facet joints, like any other joint, should be made worse with use and better with rest. And, yet, he can think of nothing at all that would make his constant pain better or worse. And, he states that it never varies.

His second complaint is of a sharp pain, which he says is in the "same region" as the constant pain. He says that this sharp pain is "just a quick stab that lasts for one second." He says that he will get this sharp pain between 15 and 20 times a day. And, surprisingly, he says that this pain also comes and goes for no apparent reason. He says that it is "so unpredictable."

Thus, once again, he is alleging a mechanical problem in his back, but it does not behave as a mechanical problem. He does, however, express the opinion that it may occur more frequently when rising up after bending forward.

He complains of pain, numbness, tingling and coldness in both lower extremities. He says that his symptoms in the right lower extremity have been getting progressively worse. And, when he is seen today, they are equally strong in both lower extremities, and they occur with equal frequency in both lower extremities.

He says that his leg symptoms begin as a mild discomfort in his buttock that spreads down the back of each thigh and the back of each calf and into the bottom of each foot. He says that this mild discomfort then becomes a numbness and then it becomes tingling or pins and needles. Along with that, he will have a cold sensation.

Since he did not appear to be claiming any pain in either lower extremity beyond a mild discomfort, he was asked if there was any pain, and he then stated that he did, indeed, have pain and that the mild discomfort was actually a pain. He did say that the leg symptoms were not constant.

PATTERSON, Stephen

He said that the leg symptoms would occur as the result of sitting continuously for 20 or 25 minutes. He might also get them as a result of standing for 45 to 60 minutes. He says that he is able to make the leg symptoms go away by lying down and stretching, and they will then go away in about 30 minutes.

He then goes on to say that the leg pains are strong enough for him to want to take Ibuprofen.

He says that he is able to sit comfortably for 10 or 15 minutes, after which he will get the leg symptoms, and he will need to get up. This was felt to be contradicted by his statement a few minutes before that his leg symptoms would not start until he had been sitting for 20 or 25 minutes.

He said that he was able to remain standing for 30 to 60 minutes, after which his back would become "more uncomfortable," and he would then need to move or lye down and stretch.

He said that he was able to walk or shop for 15 minutes or "less than one mile." He said that prolonged walking would cause an "uncomfortable" pain in his back, as well as cold and tingling in both lower extremities.

He is able to go up and down stairs, but he says that he might use the railing when going up stairs.

He said that he was able to drive for up to one hour, but he would be bent over when he got out of his vehicle.

He said that he was able to comfortably lift and carry 20 pounds without aggravating himself.

He said that at night he would sleep on either side, and he would sleep between four and five hours each night. He also takes a nap everyday for one to one and one half hours.

His daily routine consists of rising between 7:30 and 8:00 a.m. He will first go to the bathroom. After that he will make coffee and then he will stretch. After that he will have breakfast and read the newspaper.

He says that after breakfast he will "lye around" because sitting and standing are not comfortable. He then goes on to say that most of his day will be spent studying for the promotional exam, which will take place on 11/15/03. He says that most of his day is spent lying on the rug on his side studying.

He says that he might have lunch with his mother at the nursing home or else he might go out for lunch or have lunch at home. He says that after lunch he will go to the bank or run other errands. He will also take his nap.

PATTERSON, Stephen

He will have dinner at 6:30. At that time his girlfriend may visit. Sometimes he will go out for dinner. He says that he is not able to sit through an entire movie and does not go to movies. He says that he is able to slow dance, but doing so is not comfortable. He will go to bed between 12:30 and 1:00 a.m.

On examination he is a lean, pleasant and cooperative person. He has a normal gait. During the interview, he spent approximately 50% of the time standing up or leaning against the furniture.

When he stood erect, the shoulders and pelvis were level, the head was in the midline, the spine was straight. There was a slightly increased lower dorsal kyphosis.

He was able to walk well on his heels and toes with good balance and strength. He reported having slight discomfort walking on his heels.

If he leaned on both hands, he was able to go into a squat, and he got 2/3 of the way down. He then said that he was prevented from going further by pain over his sacrum at S3.

Forward bending through the waist was 80 degrees, and he could touch the mid point of his tibia. At that point he was prevented from going further by pain and a tight feeling over the center of his sacrum.

Back bending through the waist was 25 degrees, and he again complained of pain over his sacrum. This time, however, he pointed to an area about 1 inch higher by S2. He still did not report any pain by the lumbar spine.

Side bending through the waist was 30 degrees to right and left, and he said that this caused the "same" pain over his sacrum.

Rotation through the waist was 40 degrees to right and left and he again said that this aggravated the pain over the center of his sacrum.

Thus, all provocative spine movements failed to cause any symptoms in the lumbar spine. They did all produce symptoms over the sacrum. This is important because pain over the sacrum is felt to be of a nonorganic basis.

Both thighs were measured 3 inches proximal to the superior pole of the patella. The right thigh was 14 inches in circumference; the left was 14 ½ inches in circumference. Both calves were measured at the point of greatest circumference, and both calves were 14 ¾ inches in circumference. All measurements were repeated three times. The smaller size of the right thigh is felt to be consistent with his prior thigh fracture and knee injury, and the right knee joint did have a 2 to 3+ effusion, and the left knee joint had no effusion.

PATTERSON, Stephen

Deep tendon reflexes were 1+ at both knees and 2+ at both ankles.

Seated straight leg raising was possible to 70 degrees on either side and could be held there while his knees were examined with no discomfort.

In the supine position, the right hip would flex 90 degrees, and he reported having pain over his sacrum beyond 80 degrees. He allowed the left hip to flex 100 degrees, and he complained of pain over his sacrum shooting to the left buttock.

Supine straight leg raising was possible to 65 degrees on the right, and he complained of pain over his sacrum shooting to the right buttock. Supine straight leg raising was 65 degrees on the left, and he again complained of pain over his sacrum shooting to the left buttock.

Thus, seated and supine straight leg raising failed to cause or reproduce his alleged sciatic symptoms.

In the supine position, he was able to lift the right leg off the table by itself, and doing so produced no symptoms.

He was able to lift the left leg off the table by itself, and this caused slight pain over the center of his sacrum.

He was able to lift both legs off the table simultaneously, and he said that this caused low back pain "at dead center" by the S3 vertebra.

Significantly, every time he points to the midpoint of his sacrum by S3, he refers to it as his "L4-5."

In the prone position, his spine was lightly and firmly palpated from the base of his neck down to the coccyx. There was no tenderness anywhere over the thoracic spine. There was slight tenderness over L5, and the majority of his tenderness extended from S1 down to the coccyx in the midline.

When his back was again palpated working from the coccyx upward, he said that the tenderness "fades out" at the L5 level, and there was no tenderness at all at L4 or above.

His spine was palpated yet one more time, and this time he did report being tender by L5. However, he was then asked to compare the tenderness at L5 with the tenderness at S3, and he was very certain that S3 was more tender than L5.

All of this is extremely important because he is alleging a disc, nerve or facet problem at L4 or L5 and, yet, he does not localize his pain by the lumbar spine, and he does not even localize his tenderness by the lumbar spine. Instead he localizes his pain and his tenderness over the sacrum, and pain or tenderness in that area is felt to be of a nonorganic basis.

PATTERSON, Stephen

He reported having very slight tenderness by the right and left sacroiliac joints.

The lumbar MRI scan of 3/25/03 was available for review. Sagittal views included T11 down to S3. These showed a normal lordosis. There was a loss of signal from the L4-5 and L5-S1 discs. There was moderate narrowing of the L5-S1 disc. The neuro foramen at the L5-S1 level were small on both sides but still very adequate for the nerve root to exit. These were equal on both sides. The spinal canal itself was large.

Sagittal views also showed very slight bulging of the L4-5 disc and a slightly larger bulge of the L5-S1 disc. There was no increased signal in the annulus of any disc.

There were T2 weighted axial views. These showed a right paramedian bulge of the L5-S1 disc that just barely made contact with the dura and both S1 nerve roots. There was a very slight and diffuse bulge of the L4-5 disc. The axial views extended from T12 down to S1.

Based on my review of the medical records, the history given to me today by Mr. Patterson, my examination of Mr. Patterson and my review of the lumbar MRI scan, I come to the following conclusions:

Diagnoses:

(1) Non-symptomatic mild degenerative changes of the L4-5 and L5-S1 discs;
(2) Multiple somatic complaints without clear organic cause.

I find no causal connection between either of the above conditions and his employment as a fireman for the City of Woburn Fire Department or any injury he might have suffered while working as a fireman for the City of Woburn Fire Department.

Prognosis: This appears to be very good. On today's examination, there is no subjective or objective evidence of any ongoing impairment or disability coming from the lumbar spine.

Based on today's examination, he is able to return to work at the present time on a full time, full duty basis.

Based on today's examination, it is not necessary to impose any work limitations.

PATTERSON, Stephen

He reported having very slight tenderness by the right and left sacroiliac joints.

The lumbar MRI scan of 3/25/03 was available for review. Sagittal views included T11 down to S3. These showed a normal lordosis. There was a loss of signal from the L4-5 and L5-S1 discs. There was moderate narrowing of the L5-S1 disc. The neuro foramen at the L5-S1 level were small on both sides but still very adequate for the nerve root to exit. These were equal on both sides. The spinal canal itself was large.

Sagittal views also showed very slight bulging of the L4-5 disc and a slightly larger bulge of the L5-S1 disc. There was no increased signal in the annulus of any disc.

There were T2 weighted axial views. These showed a right paramedian bulge of the L5-S1 disc that just barely made contact with the dura and both S1 nerve roots. There was a very slight and diffuse bulge of the L4-5 disc. The axial views extended from T12 down to S1.

Based on my review of the medical records, the history given to me today by Mr. Patterson, my examination of Mr. Patterson and my review of the lumbar MRI scan, I come to the following conclusions:

Diagnoses:

(1) Non-symptomatic mild degenerative changes of the L4-5 and L5-S1 discs;
(2) Multiple somatic complaints without clear organic cause.

I find no causal connection between either of the above conditions and his employment as a fireman for the City of Woburn Fire Department or any injury he might have suffered while working as a fireman for the City of Woburn Fire Department.

Prognosis: This appears to be very good. On today's examination, there is no subjective or objective evidence of any ongoing impairment or disability coming from the lumbar spine.

Based on today's examination, he is able to return to work at the present time on a full time, full duty basis.

Based on today's examination, it is not necessary to impose any work limitations.

PATTERSON, Stephen

Based on today's examination, there is no indication for any further testing, evaluation or treatment.

If I may answer any further questions, please let me know.

Sincerely yours,

*Robert R. Pennell*

Robert R. Pennell, M.D., P.C.

RRP/pam

Oct 19 04 11:40a

# ROBERT R. PENNELL, M.D., P.C.
## 225 BOSTON STREET
## LYNN, MASSACHUSETTS 01904

TEL (781) 593-5430
FAX (781) 593-6149

BOARD CERTIFIED ORTHOPEDIC SURGEON

MEDICAL EVALUATION SPECIALIST

Sterling Acres Medical Arts Building
23 Worcester Road, Route 12
Sterling, Massachusetts 01564
(978) 422-8121

Reply to: LYNN OFFICE

## CERTIFICATION

Pursuant to Massachusetts General Laws, Chapter 233, Section 79G, under the pains and penalties of perjury, I swear the attached report dated   October 8, 2003   represents my report concerning   Stephen Patterson   .

Date:   October 8, 2003

*Robert R. Pennell M.D.*

Robert R. Pennell, M.D., P.C.